## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK
## ROCHESTER DIVISION

| | |
|---|---|
| CDS HOUSING, LLC and CORNING COUNCIL FOR ASSISTANCE AND INFORMATION FOR THE DISABLED, INC., D/B/A AIM INDEPENDENT LIVING CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF ELMIRA and DANIEL MANDELL, <br> Defendants. | **COMPLAINT** <br><br> Case No. _____ <br><br> **Jury Trial Demanded** |

## <u>INTRODUCTION</u>

1.      This civil rights action challenges the City of Elmira's unlawful and discriminatory scuttling of a planned affordable, supportive housing complex for people over 55 and those with disabilities. Despite the clear command of federal civil rights laws, and in the face of a citywide supportive housing crisis, the Defendants—the City of Elmira (the "City") and its Mayor, Daniel Mandell (the "Mayor") (together, the "Defendants")—used their power to block construction of the housing complex for the express purpose of excluding people with disabilities from a desirable neighborhood.

2.      The Plaintiffs are organizations with a long history of providing housing and supportive services. In 2018, AIM Independent Living Center ("AIM") and CDS Housing, LLC ("CDS") successfully collaborated with the City of Elmira and New York State to develop a housing complex on Maple Avenue in Elmira's Miller Pond neighborhood. The existing complex provides affordable housing and on-site supportive services for people with intellectual and

developmental disabilities, seniors, and veterans. The Maple Avenue complex has been a huge success—it is a source of high-quality affordable housing in a region where very little is available. For its residents with disabilities, the Maple Avenue complex has also provided vital supportive services, like educational and nutrition classes and connections with community resources. Since it opened, demand for the Maple Avenue complex has been high and there are now over 160 people on the waitlist.

3.    In the face of an ongoing housing crisis in Elmira and the surrounding area, AIM and CDS sought to construct a second apartment complex next door. The Plaintiffs developed a plan to build "Phase II"—fifty new units of affordable housing, including 15 supportive units for people with disabilities—on the plot of land next to its first development on Maple Avenue ("Phase I"). As they had previously done, the Plaintiffs coordinated with Elmira officials, complied with all applicable laws and regulations, and completed Elmira's multi-step, multi-agency approval process for the construction of the planned development.

4.    But instead of advancing the Plaintiffs' efforts to bring much-needed housing to the City, the Defendants acquiesced to the demands of a vocal group of disgruntled neighbors to block it. A small number of nearby residents attended public hearings and persistently lobbied the Defendants to stop the development. Their opposition was loudly and explicitly grounded in discriminatory attitudes toward people with disabilities, repeatedly targeting the subset of units that would be reserved for people with disabilities. Time and again, opponents of the development disparaged these potential residents, making unsubstantiated and discriminatory claims about them. They suggested that allowing this second affordable and supportive housing complex would increase crime, lower property values, and bring unwanted people into their neighborhood. Their message was clear: they did not want these residents with disabilities living in their community.

5.      Opponents of the project found champions in Elmira Mayor Daniel Mandell and the Elmira City Council. In June 2023, the Mayor began publicly echoing the same discriminatory language used by the opponents to decry the proposed development, explaining that he opposed the project because people with disabilities would live there.

6.      In August 2023, when the City Planning Commission certified that the Phase II project complied with all applicable standards and regulations, the Mayor and the City Council intervened to override the City Planning Commission's determination. The Mayor sponsored a City Council resolution targeting the proposed development that amended Elmira's zoning map to rezone *only* the parcel of land where Phase II was to be located. The new resolution prohibited multifamily housing on the Plaintiffs' parcel, making development of Phase II unlawful under Elmira's zoning code. The Plaintiffs and advocates for people with disabilities vociferously opposed the proposed zoning amendment. The City Council unanimously adopted the Mayor's resolution and amended the zoning map on December 4, 2023.

7.      The Defendants took these actions for the express purpose of vindicating the project opponents', and their own, discriminatory animus toward prospective residents with disabilities. The Defendants' discriminatory actions violated the Fair Housing Act, the Americans with Disabilities Act, the Rehabilitation Act, and the New York State Human Rights Law.

8.      The Plaintiffs bring this action seeking declaratory and injunctive relief to reverse the Defendants' discriminatory and unlawful rezoning decision and to enable the construction and operation of their planned affordable and supportive housing development, as well as damages to redress the Defendants' unlawful conduct.

## PARTIES

9.      Plaintiff Corning Council for Assistance and Information for the Disabled, Inc., d/b/a AIM Independent Living Center ("AIM"), is a domestic not-for-profit corporation organized

under the laws of the State of New York, with its principal place of business located at 271 East First Street, Corning, New York. At all relevant times, AIM has conducted business under the assumed name AIM Independent Living Center, pursuant to a Certificate of Assumed Name filed with the Office of the Secretary of State in compliance with New York General Business Law § 130. AIM is a supportive services provider and advocacy organization that provides a wide array of home- and community-based services for people with all types of disabilities. AIM also assists veterans, nursing home residents, people who are experiencing homelessness, those in recovery, and those with unmet needs.

10.     Plaintiff CDS Housing, LLC is a limited liability corporation organized under the laws of the State of New York, with its principal place of business located at 860 Hard Road, Webster, New York. CDS Housing, LLC and affiliated entities (collectively, "CDS") offer high-quality, accessible, and affordable community-based housing, serving seniors, families, veterans, people with intellectual and developmental disabilities, and other vulnerable populations.

11.     Defendant City of Elmira is a municipality in the State of New York. The City of Elmira receives federal funding, including through the U.S. Department of Housing and Urban Development's federal grant programs, which include the Community Development Block Grant Program, the HOME Investment Partnership Grant, and the Lead Hazard Control Grant. Approximately 1.8 percent of the funding for the City's 2025 operating budget derives from federal sources.

12.     Defendant Daniel Mandell is the Mayor of the City of Elmira. Mayor Mandell sponsored City Council Resolution Numbers 2023-256 and 2023-380 to rezone the parcel of land where Phase II was to be located.

## FACTS

### Elmira's Need for Affordable, Supportive Housing

13.    Elmira has a dearth of high-quality affordable housing. As the City has recognized, "poor quality, vacant, uninhabitable units remain a major issue within the City of Elmira."[1]

14.    The median household income in Elmira is \$43,089,[2] and the gross rent is \$753 for studio apartments and \$929 for two-bedroom apartments.[3] As a result of the rent prices relative to income levels in Elmira, almost half of Elmira's renters devote 35 percent or more of their household income to paying rent.[4] These households are "cost-burdened" if their housing costs exceed thirty percent of their income, or "severely cost-burdened" if their housing costs exceed fifty percent of their income.[5]

15.    The City's lack of high-quality affordable housing particularly impacts individuals living with disabilities. Approximately 19 percent of Elmira's residents are living with disabilities.[6] Almost a quarter of these individuals live below the federal poverty level.[7]

16.    The City has confirmed its need for a "new housing development in the City that is inclusive to persons with disabilities."[8]

---

[1] *Analysis of Impediments to Fair Housing Choice: City of Elmira*, at 10 (2020), https://www.cityofelmira.net/DocumentCenter/View/236/City-of-Elmira-Analysis-of-Fair-Housing-Impediments-2020-PDF. As of 2020, the City estimated that there were only 645 available rental units that were affordable for households earning 30 percent or less of the area median income. *Id.* This left a shortfall of 2,145 units for this income group alone. *Id.*

[2] *Elmira City, New York: Income and Poverty*, U.S. Census Bureau, https://data.census.gov/all?q=Elmira+city,+New+York+Income+and+Poverty.

[3] *Selected Housing Financial Characteristics: Renter Costs, Chemung County, NY Census,* U.S. Census Bureau, https://data.census.gov/table?t=Financial+Characteristics:Renter+Costs&g=060XX00US3601524229.

[4] *Id.*

[5] *CHAS: Background*, U.S. Department of Housing and Urban Development Office of Policy Development and Research, https://www.huduser.gov/portal/datasets/cp/CHAS/bg_chas.html.

[6] *Elmira City, New York,* U.S. Census Bureau, https://data.census.gov/profile/Elmira_city,_New_York?g=160XX00US3624229#health.

[7] *American Community Survey 2019–2023: Selected Characteristics of People at Specified Levels of Poverty in the Past 12 Months, Chemung Cnty., N.Y.,* U.S. Census Bureau, https://data.census.gov/table/ACSST5Y2023.S1703?t=Income+and+Poverty&g=050XX00US36015.

[8] *Analysis of Impediments to Fair Housing Choice: City of Elmira*, supra note 1, at 6.

17.    The need for quality, affordable housing is also particularly acute for people of color in Elmira, who are significantly more likely than white residents to live in poverty. Fifteen percent of Elmira residents are Black, six percent are Hispanic or Latine, and less than one percent are Asian or Indigenous. Compared to the City's poverty rate of 27 percent, approximately 88 percent of City's Indigenous residents, 42.3 percent of Latine residents, and 30.6 percent of Black residents live below the poverty line.[9]

***CDS and AIM Develop Phase I to Address Elmira's Need for Affordable, Supportive Housing***

18.    CDS specializes in developing high-quality, accessible, affordable community-based housing for seniors, families, veterans, and people living with intellectual and developmental disabilities—populations that are among the highest-need and most underserved in Elmira.

19.    CDS has a track record for developing high-quality rental housing. As of October 2025, CDS has developed ten rental housing developments, nine of which are in New York State, ranging in size from 14 to over 160 housing units. All of these developments include units allotted for specific populations receiving supportive services, such as seniors, people living with disabilities, veterans, and survivors of domestic violence.

20.    CDS partners with local service providers to provide supportive services to its tenants in these housing developments.

21.    CDS Housing, LLC owns the 8.5-acre parcel of land on Maple Avenue ("Maple Avenue Parcel") in Elmira that it acquired to expand affordable, supportive housing in the City. The Maple Avenue Parcel is located within a census tract with a lower poverty rate than the City as a whole.

---

[9] *American Community Survey 2019–2023,* supra note 7.

22.     In 2016, the Maple Avenue Parcel was zoned as a "Residence P" district. This zoning designation "permit[s] and encourage[s] the development of well-planned, high-density, residential neighborhoods or groups of residences on sites larger than normal building lots."[10]

23.     In response to Elmira's need for affordable housing for people with disabilities and the elderly, CDS constructed a fifty-unit apartment complex (the "Phase I" development) on its Maple Avenue Parcel.

24.     In order to construct the Phase I development, CDS obtained site plan approval from the City Planning Commission, a process required prior to beginning residential construction projects.

25.     After successfully completing the site plan approval process, CDS constructed the Phase I development, which opened in December 2018.

26.     The Phase I development is a two-story complex consisting of fifty one-bedroom apartment units, as well as various apartment and community amenities for tenants. The development is architecturally consistent with the surrounding neighborhood, which is home to other low-rise residential structures, including a 193-unit apartment complex, as well as grocery stores, banks, shopping centers, post offices, and hospitals.

27.     All fifty units in the Phase I development are affordable housing units that serve residents earning under 60 percent of the area median income. At the time the complex opened, rent and utilities ranged from $345 to $665 per month combined.

28.     Forty of the Phase I units are restricted to people aged 55 and over. The remaining ten units are not age-restricted and are set aside for people living with disabilities who receive

---

[10] *Code of Ordinances of the City of Elmira*, Appendix B (Zoning), Art. II, Sec. 250.15 (2024), https://library.municode.com/ny/elmira/codes/code_of_ordinances?nodeId=PTIICOOR_APXBZO.

rental subsidies from the New York State Office for People with Developmental Disabilities ("OPWDD").

29.     CDS partners with AIM to provide on-site supportive services to Phase I residents receiving OPWDD subsidies.

30.     AIM is a supportive services provider and advocacy organization that provides a wide array of home- and community-based services for people living with disabilities, people who are unhoused, and other groups of people living with unmet needs.

31.     AIM has worked with CDS to provide various on-site supportive services at the Phase I complex since it was constructed. These services include providing residents with information about and referrals to relevant community services and programs, acting as an advocate and liaison between residents living with disabilities and property management, providing case management services, establishing educational programs and nutrition classes, and assisting with the development of a tenants' association.

32.     The Phase I development has operated at full capacity since it opened.

33.     The demand for housing at the Phase I development has been consistently high since the development opened. Currently, CDS has a waitlist of over 160 individuals who have applied for housing units at the Phase I development.

### *CDS and AIM Collaborate to Develop Maple Avenue Phase II*

34.     In response to the continued high need for additional high-quality affordable housing in Elmira, CDS and AIM initiated a project in 2022 to construct a second affordable housing complex on its Maple Avenue property (the "Phase II" development).

35.     This project was designed to consist of fifty affordable housing units, 35 of which would be earmarked for people aged 55 and over and 15 for residents living with disabilities.

36. Of the 15 units designated for individuals living with disabilities, five were to be designated for homeless veterans with disabilities, five for homeless seniors with disabilities, and five for chronically homeless individuals.[11]

37. AIM planned to provide a wide array of supportive services for residents of the Phase II development, including service referrals, employment support, connection to health and specialty care, transportation coordination, assistance with benefits applications, advocacy with third parties, food-security services, homecare coordination, and peer support.

38. In order to fund the provision of social services at the Phase II location, AIM applied for funding through the New York State Office of Mental Health's Empire State Supportive Housing Initiative ("ESSHI") in 2022.

39. ESSHI grants provide service and operating funding for congregate supportive housing across the state. The target populations for ESSHI-supported housing are "families or individuals who are both homeless . . . and who are identified as having an unmet housing need . . . AND have one or more disabling conditions or other life challenges."[12]

40. AIM devoted many hours to assembling its ESSHI application.

41. In December 2022, AIM received a conditional ESSHI award for the Phase II project. The ESSHI award was conditioned on securing capital financing for the project. Due to the Defendants' subsequent discriminatory rezoning of the Maple Avenue Parcel, however, AIM was ultimately unable to operationalize the project and its 2022 conditional ESSHI award expired.

---

[11] A "chronically homeless" individual is a homeless individual with a disability who lives either in a place not meant for human habitation, a safe haven, or in an emergency shelter, or in an institutional care facility if the individual has been living in the facility for fewer than 90 days and had been living in a place not meant for human habitation, a safe haven, or in an emergency shelter immediately before entering the institutional care facility. *See* 24 C.F.R. §§ 91.5, 578.33.

[12] Empire State Supportive Housing Initiative, *Inter-Agency Service and Operating Funding Opportunity Request for Proposals*, New York State Office of Mental Health (2023), https://omh.ny.gov/omhweb/rfp/2023/esshi/esshi_round_eight_rfp_final.pdf.

42.     Under the 2022 ESSHI award, AIM would have received $375,000 per year for a contract term of five years. The expected duration of the grant was six contract cycles, meaning that the funding would likely have been available for 30 years. AIM anticipated a two percent funding increase every year which, given compounding increases, would have resulted in funding in excess of $15 million over the life of the funding contract.

43.     AIM subsequently reapplied for and received another conditional ESSHI award for the Phase II project in 2025. However, if the rezoning of the Maple Avenue Parcel is not reversed, AIM will again be unable to operationalize the conditional ESSHI award before it expires.

### *Elmira's Land Use Approval Procedure*

44.     To develop Phase II, CDS and AIM complied with every element of Elmira's required land use procedure.

45.     The Zoning Ordinance of the City of Elmira (the "Zoning Ordinance") governs permitted land uses. The Zoning Ordinance is adopted by the City Council and the Mayor.

46.     The Zoning Ordinance specifies permitted, conditional, and prohibited land uses for each land parcel in the City. In order to use land in a certain way—for example, to construct an apartment building—a landowner must ensure that the proposed use comports with the applicable zoning designation for the land parcel.

47.     If a landowner seeks to use their parcel of land in a manner permitted by the parcel's zoning designation, they do not need any additional approval from the City Council.

48.     However, compliance with the applicable zoning designation does not automatically entitle a landowner to build anything permitted by the Zoning Ordinance. Other provisions of the Zoning Ordinance may apply and impose requirements on landowners.

49.     One such requirement is that the construction of major projects receive site plan approval from the City Planning Commission. The City Planning Commission is comprised of five

appointed individuals and is "charged with carrying out the requirements delegated to it" by the City's Zoning Ordinance, which include reviewing site plans, hearing public comments, and making recommendations to the City Council regarding zoning regulation amendments.[13]

50.    The Zoning Ordinance defines a major project as "a specific plan, design or planned undertaking determined by a representative of the City of Elmira Bureau of Inspection Services which requires planning commission action and approval including, but not limited to, new industrial, commercial or residential construction, subdivisions, or business expansion, as well as any project requiring a special permit or a variance."[14]

51.    To obtain site plan approval, an applicant must first participate in at least one pre-application conference. A pre-application conference consists of one or more meetings scheduled between the applicant, a representative of the City of Elmira Bureau of Inspection Services, and at least one member of the City Planning Commission or Zoning Board of Appeals. The pre-application conference is held prior to the applicant's appearance before either the City Planning Commission or Zoning Board of Appeals.

52.    During the pre-application conference, participants address several issues "including, but not limited to, the approval process in general, the documents and site plans required and any outstanding concerns which need to be addressed prior to the applicant's appearance before the planning commission or zoning board of appeals."[15]

53.    After the pre-application conference, the applicant develops their site plan application and submits it for review to the City Planning Commission. The Zoning Ordinance

---

[13] Elmira Zoning Ordinance, Art. I, Sec. 110; *City Planning Commission*, City of Elmira, https://cityofelmira.net/267/City-Planning-Commission; *Boards & Commission*, City of Elmira, https://www.cityofelmira.net/266/Boards-Commissions.
[14] Elmira Zoning Ordinance, Art. I, Sec. 110.
[15] *Id.*

identifies ten factors that the City Planning Commission must consider when reviewing a site plan application:

1)      Location, arrangement, size, design and general site compatibility of buildings, lighting and signs;

2)      Adequacy and arrangement of vehicular traffic access and circulation, including intersections, road widths, pavement surfaces, dividers and traffic controls;

3)      Location, arrangement, appearance and sufficiency of off-street parking and loading;

4)      Adequacy and arrangement of pedestrian traffic access and circulation, walkway structures, control of intersections with vehicular traffic and overall pedestrian convenience;

5)      Adequacy of stormwater and drainage facilities, including a stormwater pollution prevention plan (SWPPP) consistent with the requirements of this local law . . .;

6)      Adequacy of water supply and sewage disposal facilities;

7)      Adequacy, type and arrangement of trees, shrubs and other landscaping constituting a visual and/or noise buffer between the applicant's and adjoining lands, including the maximum retention of existing vegetation;

8)      Adequacy of fire lanes and other emergency zones and the provision of fire hydrants;

9)      Special attention to the adequacy and impact of structure, roadways and landscaping in areas with susceptibility to ponding, flooding and/or erosion; and

10)     Overall impact of the proposed project upon the neighborhood, including compatibility of design and historic considerations.[16]

54.     Site plan applications cannot be denied based on the desirability of the acceptable use.

---

[16] Elmira Zoning Ordinance, Art. X, Sec. 1025.

55.    The City Planning Commission is also permitted to hold a public hearing on a site plan application.

56.    The City Planning Commission may take action on a site plan application by simple majority. Site plan approval does not require the involvement of the City Council.

57.    The City Planning Commission is required to refer certain site plan applications to the Chemung County Planning Board for its recommendation.

### The Defendants Initially Support Phase II

58.    On January 30, 2023, CDS and AIM attended a pre-application conference with the Mayor, Elmira City Manager Mike Collins, and Elmira Director of Community Development Emma Miran. During this conference, the Plaintiffs presented their proposal for the Phase II development, including project funding sources and an anticipated project schedule, and discussed AIM and CDS's desire to build housing for seniors and individuals with disabilities.

59.    Immediately following the conference, the Mayor sent CDS an email thanking the organization for its "interest in building another apa[rtment] complex in our City" and stating, "We look forward to partnering with you and AIM to help this project become a reality."

60.    Based on this assurance, the Plaintiffs' conversations with members of the City Planning Commission and employees of the Bureau of Inspection Services, and the Plaintiffs' experience constructing the Phase I development, the Plaintiffs understood that they would be able to develop a proposal that met all the requirements for site plan approval. Accordingly, after the pre-application conference, the Plaintiffs began to develop the required plans to obtain approval and begin construction.

### Discriminatory Public Opposition to Phase II

61.    On April 14, 2023, CDS and AIM submitted their site plan approval application to the City Planning Commission.

62.     Between May and December 2023, the City Council, the City Planning Commission, and the Chemung County Planning Board held six public meetings at which they received oral and written comments. A small group of disgruntled neighbors consistently attended each of these meetings and lobbied each governing body to take action against the Phase II development. The first wave of public pressure occurred between May and July of 2023, when the City Planning Commission was considering CDS's site plan application.

63.     The opposition to the development focused on a subset of the people who might reside there: the residents with disabilities. This population, consisting of only 15 people, would be comprised of people with disabilities and people experiencing chronic homelessness living with co-occurring disabilities. In meeting after meeting, public commenters singled out these potential residents as a significant reason they opposed the development. Some opponents even suggested that they would not be opposed to the development at all if none of the units were allocated to people with disabilities.

64.     Those opposed to the residents with disabilities repeatedly alleged that these residents were likely to engage in drug use, cause general disorder, harm property values, make neighbors and the development's other residents less safe, and harm the "character of the community." To support these allegations, many opponents made baseless claims about the residents with disabilities currently living in the Phase I apartments.

65.     During the first public comments on the development, which occurred before the Chemung County Planning Board on May 25, 2023, County Legislator Scott Drake objected to the project because of the presence of the residents with disabilities. According to the Planning Board's record of the meeting, Drake stated that the OPWDD-supported residents with developmental disabilities in the Phase I apartments were "causing issues with safety, drug use,

smoking in a closet that caused a fire, [and] attempted suicide." He claimed that these residents "put fear in the other tenants."

66.     Days later, at a June 1, 2023 City Planning Commission meeting, another opponent of the project stated: "Another problem we have is the age restriction, or the lack thereof. This problem of age being simply this: there are people in that building presently who are under the age of 55 years old. We can talk to you about maybe a couple of people who we've talked to personally that are residents of that building that are having a problem being mixed with people that are smoking pot, that they can't sit on their balcony, that they can smell it all day, and so on and so forth." This resident, Mike Hamilton, was identified as a spokesperson for the group of opponents and frequently purported to speak on its behalf.

67.     Another opponent at the June 1 City Planning Commission meeting echoed the same concern about the residents with disabilities: "It's a beautiful idea that this is a quiet retirement complex. It's not what it is. It is busy. It is active. And it is *irregular*. These people walk the path . . . cussin [sic] on balconies, bitchin [sic] out maintenance people, being obnoxious" (emphasis added). Yet another opponent asked the City Planning Commission: "How would you like this big three-story monstrosity right on your property line, looking at your house, with these type of, excuse me, but *this type of clientele* in there that we know will be back?" (emphasis added).

68.     On June 20, 2023, at a City Council meeting, the neighbors again focused on the disabled residents of the planned development and existing Phase I apartments. Hamilton stated:

> "This is not senior housing. Phase I, a 50-unit two-story building has ten units or 20 percent of those units that are earmarked for AIM residents. The new Phase II, they've earmarked 15 units or now 30 percent of those units for AIM. So AIM somehow subsidizes this we understand, so AIM has a right to put in their people that are not 55 and above. And I've spoken to many residents in the project and they're dissatisfied that they sit on their balcony and they hear music and they smell pot and they're running into people that are not 55 and above. That's just the beginning."

69.    During the same time period, the neighbors also made their opposition to the development known on social media, including Facebook and Nextdoor, a social media network platform for neighborhoods.  Rallying community members to publicly oppose the development, Mike Hamilton stated: "CDS Project Housing SELLS themselves as 'affordable senior housing', 10 units in the first building & 15 units in phase 2 are earmarked for AIM residents under 55. Mixing drug addicted and behavioral problems with seniors is NOT affordable senior housing."

70.    Another resident who frequently spoke at public hearings posted: "If you do not want the space occupied by a three story apartment building NOT just housing veterans and seniors either write your councilman or please share your email address."

### The Mayor Champions Discriminatory Opposition to Phase II

71.    Mayor Mandell publicly championed the opponents' efforts to prevent the development and echoed their hostility towards the subset of residents with disabilities.

72.    After the opponents voiced their complaints about the Phase II project at the May 25 County Planning Board meeting, the June 1 City Planning Commission meeting, and the June 20 City Council meeting, the Mayor responded by making public statements opposing the project. The Mayor singled out the potential residents with disabilities as the primary source of his opposition to the project.

73.    In an interview with a local news station following the June 20 City Council meeting, Mayor Mandell—himself a member of the City Council—stated that he did not believe it was appropriate to house people with disabilities in the same apartment building as the over-55 residents, and that residents with disabilities would also cause problems for the neighbors:

> I think the people they have now, that are in there, they are under 55, *they're creating problems for the seniors.* I would not recommend, ah, comingling that type of, uh, those individuals, the younger people that are, um, [sic] *problems with some drug use* over there, uh, loud music, it's just not conducive to a senior living complex. . . . So, and most of it

16

stems from this group of people that are under 55 years of old [sic] that they would call *special needs individual* [sic]. *Some of them have alcohol and drug addiction problems* that are still um lingering. . . . which is creating problems for not only the residents . . . but the neighbors too (emphasis added).

74.     In addition to explicitly stating that he opposed the proposed development because of the presence of people with disabilities, the Mayor also recommended that the over-55 residents of the existing Phase I development complain to CDS and request that residents with disabilities not be allowed to reside there either: "Lodge a complaint [with CDS] and say, lookit [sic], we don't appreciate this, could you please, you know, be more, you know, choosy of who you're going to put in there? We are seniors, and we would like to have other seniors living in those ten apartments, not people that are 19, 20, and so forth."

### Phase II Receives Site Plan Approval and a Negative SEQRA Declaration

75.     At the time the Mayor publicly opposed the project, the City's Zoning Ordinance allowed CDS to construct the project as-of-right. As of June 2023, the two remaining requirements for construction of the Phase II complex were site plan approval and a negative declaration under the State Environmental Quality Review Act ("SEQRA"). The City Planning Commission was responsible for both decisions.

76.     Neither the Mayor nor the City Council had any role in the City Planning Commission approval process. However, the City Council, of which the Mayor is a member, is responsible for the City's Zoning Ordinance. In a letter to the City Planning Commissioners dated June 23, 2023, Elmira Assistant Corporation Counsel Jordan Yorke reminded the Planning Commissioners that the project "is an allowed use and does not need to go to the Zoning Board or Council for approval. Therefore, Site Plan Approval is only needed in order for the project to move forward."

77.    In the same letter, Yorke reminded the City Planning Commission that its decision to approve the site plan application must be based on the factors identified in the Zoning Ordinance. He warned the City Planning Commission that it was not permitted to reject the site plan application solely because members of the Commission did not wish to allow affordable, supportive housing: "[A] conclusion that no Site Plan would be approved no matter what the plan entails just because of the Use would not be reasonable."

78.    On July 23, 2023, CDS and its consultant LaBella Associates submitted a traffic assessment to the City Planning Commission. The assessment estimated that the project would introduce "a minimal amount of traffic" to the community.

79.    CDS submitted a form to the City Planning Commission documenting its compliance with the ten required site-plan review factors. In this form, CDS reported that it developed relevant aspects of the site plan in collaboration with, and based on recommendations from, the Elmira City Fire Marshal, the City Engineer, and other Elmira City staff. CDS also developed its site plan based on recommendations from the City Planning Commission itself.

80.    Concluding that the project satisfied the required criteria, on August 3, 2023, the City Planning Commission approved CDS's site plan application.

### *The Mayor Introduces a Zoning Amendment to Block Phase II from Moving Forward*

81.    Almost immediately after the City Planning Commission approved CDS's site plan application, the Mayor sponsored Resolution Number 2023-256 in the City Council to change the zoning of the Maple Avenue Parcel and to prevent Phase II from being built. Resolution 2023-256 stated that the City Council "intend[ed] to take under consideration the rezoning of City Tax Parcel No. 99.16-4-17.1 (4.4 acres) identified as Lot B on Case Map No. 4014 filed in the Chemung County Clerk's Office on March 16, 2016 from a Residence P District (Planned Residential) to a Residence A District (One Family)."

82.     City Tax Parcel No. 99.16-4-17.1 referred to CDS's Maple Avenue Parcel on which the Phase II project was planned.

83.     At the time Phase II received site plan approval, CDS's property was zoned with the Residence P designation. This had previously allowed CDS to build the Phase I fifty-unit multifamily development as a permitted use. However, under the proposed Residence A designation, CDS would only be permitted to construct detached single-family homes.[17]

84.     In other words, the Resolution would amend the City's Zoning Map to make it unlawful for CDS to build the supportive apartment complex, even though the Phase II project had just been granted site plan approval. The Resolution targeted only the Maple Avenue Parcel where Phase II was planned and did not impact any other property.

85.     The clearest indication of the purpose of the amendment was the Resolution itself, which stated:

> WHEREAS, the reasons for the proposed rezoning are to preserve the existing neighborhood character and the surrounding residential area, as well *as it being the desire of surrounding property owners and residents* to keep the Parcel in the long-standing residential culture, character, natural elements, and wildlife enjoyed by them for decades which this proposed rezoning would ensure (emphasis added).

86.     On August 14, 2023, the City Council approved the Mayor's resolution and referred the proposed zoning amendment to the City Planning Commission and the Chemung County Planning Board for their review.

### *Opponents of the Project Pressure the City Council to Adopt the Mayor's Amendment*

87.     Between August and December 2023, opponents of the project continued exerting pressure on the City Council to pass the zoning amendment.

---

[17] The Residence A zoning designation is "intended to create, preserve and enhance areas of the city composed primarily of single-family residences built at low or medium densities on quiet streets." Elmira Zoning Ordinance, Art. II, Sec. 250.2.

88.     As they did during the meetings in May and June, public commenters repeatedly expressed that they were specifically opposed to the residents living with disabilities. At the August 14 City Council meeting, opponents reasserted their hostility towards the Phase II development, again targeting the individuals with disabilities they believed were likely to live in the complex. Mike Hamilton, a leader of the public opponents of the development, urged the City Council to block "CDS *project* housing" (emphasis added). He went on to say that, unlike the people he believed would live in the development, "we take care of our homes, we cut our grass, we don't leave junk cars in our yard."

89.     Another commenter asked the City Council to stop CDS from "[c]ramming this three-story building into this area with a transient population who have no stake in and no ties to the community and will have no private ownership" because it would "completely change the character of this area leading to its destruction." Multiple commenters stated that residents of the development would "freeload." Another commenter repeatedly stressed that the development would take a "suburban" community and make it "urban." She concluded by saying "I appreciate the fact that they appreciate our conveniences . . . but I think we've given enough."

90.     On September 28, according to the Chemung County Planning Board's record of the meeting, spokesperson Mike Hamilton explained that he "wished to clarify that 20% of the first building was for AIM residents under 55 years old. This occurred after they struck a deal regarding deed restriction. AIM residents sold advantage affordable senior housing [sic]. No one here is against that."

91.     At an October 23 public hearing held by the City Council to solicit input on the amendment, one neighbor again explained that the opponents' "concerns are that this project will not be for 55 and older as was previously stated by CDS. We know it will not be age restricted."

The same commenter went on to say that they "would feel not really safe with a back door open knowing that I have fifty more new neighbors that I don't know."

92.     Speaking at the same October 23 meeting, Hamilton alleged, without evidence, that the development would "stress critical services [such as] police, EMTs, fire." Another commenter stated that "cramming in another fifty units, a three story building, will completely change the character of this area" and that development was "like a pollution."

93.     During the same time period, Hamilton continued to make discriminatory statements on social media: "[CDS] billed it as 'Affordable Senior Housing', It is anything but. With 20% of the units 'ear-marked' for AIM residents, under the age of 55 (some with behavioral & drug use problems)." Hamilton repeatedly referred to the development in posts as "low-income project housing."

94.     Hamilton and others used these social media posts to organize the neighbors' continued public pressure on the City Council to pass the zoning amendment, notifying them of the dates of upcoming City Council meetings and encouraging them to voice their opposition to the project. Before the August 14 City Council meeting, at which the Mayor first introduced the zoning amendment, multiple people posted: "CDS is now freely disclosing that 15 of these units will be for homeless – NOT SENIOR housing. . . . We need public [sic] to show at this meeting to show support and stop this! It is easy to say nothing can be done, it take [sic] an effort to FIGHT!!"

### Residents with Disabilities and Their Advocates Oppose the Zoning Amendment

95.     Residents with disabilities, their family members, and their advocates repeatedly informed the City Council that the proposed Phase II development, and the existing Phase I apartments, were essential to their ability to live and thrive in their community. In addition to the neighbors opposing the project, multiple people made public comments in favor of the Phase II

development. Several of these commenters were residents with disabilities living in the Phase I development or were related to or worked with such residents.

96.     In response to the animus displayed by the neighbors towards the residents with disabilities, these commenters emphasized the vital importance of affordable, supportive housing. They also rebutted the baseless assertions made by the neighbors that the residents with disabilities caused the Phase I apartments to be noisy or chaotic.

97.     One person, the mother of a "higher functioning autistic person" who resided in the Phase I building, explained in a written comment to submitted to the City Council on October 23:

> [H]e has problems adjusting to change, he can not stand loud things, he likes to be left alone, among other things. The reason I mention those particular traits is the apartments suit him very well. They are quiet, safe, and secure. The times I have been there, it has been quiet and peaceful. They are very well kept up and decorated if there's a holiday. The tenants are required to keep their apartments clean and have regular checks on them. My son would not be able to handle staying there if they were any other way.

98.     The same person commented that "the neighbors don't want more of 'those' people around here. 'Those' people have just as many rights to safe and secure living in decent apartments in decent neighborhoods."

99.     On October 23, Ann Crozier, AIM's OPWDD Fiscal Intermediary Coordinator, read a letter to the City Council written by people with disabilities living in the Phase I. One resident said:

> I live in Maple Ave Apartment complex. I have lived here for four and a half years. This is the first place I've lived that I feel safe. I especially feel safe and secure as no one can enter the building without a key fob or being buzzed in. The staff who work in the building assist with any help needed and show genuine care for all residents.

100.     Crozier read another resident's statement:

> I love living here in Maple Ave apartments. I have cerebral palsy and am wheelchair bound. Living here gives me the opportunity to be independent and live on my own. My apartment is very spacious, which makes it easy for me to get around and makes everything accessible.

I love living here because everyone is friendly and I've made a lot of close relationships with my neighbors and staff. Everyone works together to keep the place tidy and well-decorated. Overall I thank the community who live here. I enjoy having responsibilities and it's had a great impact on my life and is maybe one of my biggest accomplishments.

101.    On September 28, 2023, CDS sent a letter to the Mayor and the City Council opposing the proposed zoning amendment and requesting that the City Council discontinue the rezoning process. The letter explained that reasons for the proposed rezoning were factually and legally improper and emphasized that the City of Elmira Comprehensive Plan explicitly recognizes Elmira's dire need for affordable housing for vulnerable populations.

102.    CDS did not receive a response to this letter.

103.    The City Council ignored these constituents and acceded to the opponents' demands to exclude a group of people with disabilities from their community.

*The Mayor and the City Council Accede to the Opponents' Demands*

104.    On December 4, 2023, the City Council voted unanimously in favor of Resolution 2023-380 to amend the City's Zoning Map and rezone the Maple Avenue Parcel from a Residence P designation to Residence A designation.

105.    Members of the City Council stated clearly that they were supporting the amendment in response to the public opposition to the Phase II development. Then-Councilmember Tory Kitching stated: "I respect progress, but I also respect the power of the people to give a voice to their concerns, to say what they want . . . and people were saying, 'we don't want this.' So, what are we supposed to do? That's not what we want." Councilmember Grasso echoed the same rationale: "Unfortunately when the people speak, this is the people's house and we are the people's representatives. We have to listen to them."

106.    In addition to espousing his own views, the Mayor made clear that he fully supported the opponents' skepticism toward the project, stating: "I'm gonna honor the citizens that

live in our community over there, our taxpayers." He added: "When you have 35, 40 people in a neighborhood concerned, upset over this, then it's a problem, and I will support them. I am supporting them."

### The Defendants Have Refused to Reverse the Zoning Designation Despite Knowing the Amendment Was Unlawful and Discriminatory

107.    Following the amendment of the Maple Avenue Parcel's zoning designation, AIM and CDS remained eager to work with the Defendants to address the unmet housing need for Elmira residents.

108.    Between approximately November 2024 and May 2025, CDS and AIM engaged the City in good faith dialogue about the Phase II project. In those conversations, the Mayor represented that he and the City wished to ensure quality, affordable supportive housing is available to Elmira's residents. However, the Defendants did not take any steps to reverse the zoning designation and/or ensure that CDS and AIM could obtain all required approvals from the City Planning Commission, the County Planning Board, and the City Council in order to maintain funding for the Phase II project.

109.    On March 24, 2025, AIM and CDS sent a letter to the Defendants informing them that their decision to re-zone the Phase II parcel violated federal law, including the Fair Housing Act, Americans with Disabilities Act, and the Rehabilitation Act, and asking that the Defendants reverse the zoning designation.

110.    On April 11, 2025, City of Elmira Corporation Counsel John Ryan, Jr. responded to the Plaintiffs' letter via email and stated:

> Upon review of the federal Fair Housing Act and the American with Disabilities Act, the City intends to undertake the process to rezone the parcel from a Residential A district (single family) to a Residence P district  (Planned Residential) the zoning preexisting the change to Residential A. The city council meets every two weeks.  The mayor intends to meet with residential owners abutting the subject property to discuss/explain the reason for the intended rezoning on April 22nd.  At the first council meeting following that meeting

on May 5th, the council will refer the proposed rezoning to the city planning commission and the county planning board for their comments as required by the city zoning ordinance. After those boards meet, the matter will be returned to the city council for its determination and findings. The procedure I have just outlined is required by the city's zoning ordinance.

111.    However, on May 13, 2025, the Mayor informed AIM during a phone call that the City Council no longer planned to reverse its discriminatory rezoning decision.

112.    To date, despite the City's acknowledgement of its obligations under federal law and assurances that the City would move forward with the reversing the zoning designation, the City has not taken the requested action and has not rezoned the Maple Avenue Parcel.

### The Plaintiffs Are Injured by the Zoning Amendment

113.    As a direct and intended result of the Defendants' actions, AIM and CDS suffered and continue to suffer economic losses, injury to their reputation, and frustration of their mission to cultivate accessible communities by expanding access to affordable and supportive housing for elderly people, people with disabilities, and other vulnerable community members.

114.    Because of the City's decision to prevent development of the Phase II complex, AIM lost the 30-year ESSHI grant it was conditionally awarded in 2022 to provide supportive services at the property. Over the life of the grant, AIM would have received approximately 15 million dollars. AIM planned to hire two full-time Housing Specialists and one part-time Mental Health Professional to work with and support the anticipated Phase II residents with disabilities.

115.    AIM devoted significant time to preparing its ESSHI grant applications, which included over sixty pages of writing, budget documents, and other forms. Significant time was also spent on planning and research, as well as in pre-development meetings with the City of Elmira, the Planning Commission, and CDS.

116.    In addition to this direct loss of funding, based on its decades of experience, AIM reasonably fears that it will harm its credibility with state funding entities if it ultimately fails to

operationalize the Phase II project. This could reduce its chances of receiving future awards for other projects. Additionally, the Defendants lent their credibility to the harmful accusations leveled at the Plaintiffs by public opponents of the Phase II project. This hurt AIM's reputation as an advocate and services provider in Elmira.

117.    AIM has also had to divert resources from its regular activities to advocating with the City to oppose the City's attempts to block the project.

118.    CDS spent over $200,000 preparing its application for this project. It cannot recover these funds. Additionally, CDS anticipates a total estimated loss of approximately $7 million resulting from its inability to develop and use the Phase II complex over a thirty-year period.

119.    In addition to this direct loss of funding, CDS reasonably fears that being prevented from completing the project will harm its reputation among other New York municipalities and inhibit its ability to obtain land-use approval for future projects.

120.    CDS has also had to divert resources from its regular activities to advocating with the City to oppose the City's attempts to block the project.

121.    CDS and AIM are both committed to providing quality, affordable, supportive housing to people with disabilities living in Elmira. The City's actions have frustrated their ability to achieve those core organizational missions.

122.    CDS and AIM currently have no economically viable use for the Phase II property since it has been rezoned as Residence A, a single-family only designation.

## JURISDICTION AND VENUE

123.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because the action arises under the laws of the United States—the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. This Court also has supplemental jurisdiction

over claims asserted against the Defendants under New York State law pursuant to 28 U.S.C. § 1367.

124.    Venue is proper under 28 U.S.C. § 1391(b) because the Western District of New York is the judicial district in which Plaintiffs' claims arise.

125.    Declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

## **FIRST CAUSE OF ACTION**

**Fair Housing Act, 42 U.S.C. § 3601, *et seq.***
**(Against All Defendants)**

126.    Plaintiffs reallege and incorporate the facts and allegations contained in the preceding paragraphs as if fully set forth herein.

127.    Defendants, through their actions as described herein, violate 42 U.S.C. § 3604(f)(1) because they made housing unavailable on the basis of disability.

128.    Defendants, through their actions as described herein, violate 42 U.S.C. § 3604(c) because they indicated a preference, limitation, or discrimination on the basis of disability.

129.    Defendants, through their actions as described herein, violate 42 U.S.C. § 3617 because they coerced, intimidated, threatened, and/or interfered with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the Fair Housing Act.

130.    Defendants' actions to block Plaintiffs' proposed development are based on discriminatory motives related to disability status.

131.    Defendants' actions were willful and/or taken in reckless disregard of the civil rights of the Plaintiffs.

## SECOND CAUSE OF ACTION

**Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.***
**(Against Defendant City of Elmira)**

132.    Plaintiffs reallege and incorporate the facts and allegations contained in the preceding paragraphs as if fully set forth herein.

133.    Defendants violated and continue to violate Title II of the Americans with Disabilities Act by acting in a manner that, among other things:

      a.   Denies meaningful access to community-based housing for people living with disabilities in Elmira;

      b.   Aids or perpetuates discrimination against people living with disabilities in Elmira;

      c.   Uses methods of administration that discriminate against people living with disabilities in Elmira; and

      d.   Otherwise limits people living with disabilities in Elmira from enjoying housing or the opportunity to obtain such housing in Elmira by engaging in the policies, practices, acts, and omissions described above.

134.    As a result of the discrimination alleged in the previous paragraph, Plaintiffs have sustained the injuries described herein.

## THIRD CAUSE OF ACTION

**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.***
**(Against Defendant City of Elmira)**

135.    Plaintiffs reallege and incorporate the facts and allegations contained in the preceding paragraphs as if fully set forth herein.

136.    Defendants violated and continue to violate Section 504 of the Rehabilitation Act by acting in a manner that, among other things:

    a. Denies meaningful access to community-based housing for people living with disabilities in Elmira;

    b. Aids or perpetuates discrimination against people living with disabilities in Elmira;

    c. Uses methods of administration that discriminate against people living with disabilities in Elmira; and

    d. Otherwise limits people living with disabilities in Elmira from enjoying housing or the opportunity to obtain such housing in Elmira by engaging in the policies, practices, acts, and omissions described above.

137. As a result of the discrimination alleged in the previous paragraph, Plaintiffs have sustained the injuries described herein.

### FOURTH CAUSE OF ACTION

**New York State Human Rights Law – N.Y. Executive Law § 296**
**(Against All Defendants)**

138. Plaintiffs reallege and incorporate the facts and allegations contained in the preceding paragraphs as if fully set forth herein.

139. At all times relevant hereto, Plaintiffs' proposed development was a "housing accommodation" as defined by N.Y. Executive Law § 292(10).

140. By their acts and omissions as herein described, Defendants unlawfully discriminated on the basis of disability and/or aided, abetted, incited, compelled, and/or coerced unlawful discrimination, including the withholding of a housing accommodation on the basis of disability.

141. As a direct and proximate result of this discrimination, Plaintiffs sustained the damages herein alleged.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiffs respectfully request that this Court:

a.  assert jurisdiction over this matter;

b.  render a declaratory judgment that the actions of Defendants complained of herein are in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*, and the New York State Human Rights Law, N.Y. Executive Law § 296;

c.  enter permanent injunctive relief restraining Defendants, their agents, employees, representatives, successors, or any other person acting directly or indirectly with them from unlawfully interfering with the Plaintiffs' development and directing the Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future, including, but not limited to:

    i.  annulling the discriminatory rezoning of the Maple Avenue Parcel; and

    ii.  allowing Plaintiffs to proceed with the proposed development;

d.  award compensatory damages that would fully compensate Plaintiffs for the loss caused by the conduct of Defendants alleged herein;

e.  award punitive damages that would fully compensate Plaintiffs for the loss caused by the conduct of Defendants alleged herein;

f.  award Plaintiffs costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 3613(c)(2), 42 U.S.C. § 12133, 42 U.S.C. § 794a(b), and/or N.Y. Executive Law § 297(10); and

g.  provide any other relief deemed just and equitable.

Dated: October 7, 2025
      New York, New York

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION

By: */s/ Gabriella Larios*
Gabriella Larios
Ifeyinwa Chikezie
Beth Haroules*
Wafa Junaid*
Molly K. Biklen
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300
glarios@nyclu.org
ichikezie@nyclu.org
bharoules@nyclu.org
wjunaid@nyclu.org
mbiklen@nyclu.org

KAUFMAN LIEB LEBOWITZ & FRICK LLP

Alanna Kaufman
David Lebowitz*
18 E. 48th Street, Suite 802
New York, New York 10017
(212) 660-2332
akaufman@kllflaw.com
dlebowitz@kllflaw.com

*Attorneys for Plaintiffs*

*\*Application for admission to WDNY pending*